## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------------------

AUDREY LEFFLER, *et al.*,     :
              :
    Plaintiff,     :
              :
v.            :  NO. 5:16-cv-01443-JFL
              :
CREATIVE HEALTH SERVICES, INC., :
*et al.*,           :
              :
    Defendants.   :

------------------------------------------------------------

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

   Defendants, Creative Health Services, Inc. ("Creative"), Andrew Trentacoste, Kathy Kumitis, Tim Alleva and Karen Becker, by their undersigned counsel, respectfully submit this Brief in Support of their Motion for Summary Judgment dismissing the claims of Plaintiffs Audrey Leffler and Mark Merryman with prejudice pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.  PRELIMINARY STATEMENT

   This is an action brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.*, by two professional psychological therapists, who formerly practiced their craft as independent contractors with Creative, a not for profit mental health agency located in Pottstown, Pennsylvania.  Independent contractors are not eligible to assert claims under the FLSA.[1]  Both Plaintiffs in this case voluntarily chose the status of independent contractors specifically for the flexibility it gave them, both in terms of setting their own schedules and to

---

[1] *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947); *Murray v. Playmaker Services, LLC*, 512 F.Supp. 2d 1273, 1276 (S.D. Fla. 2007).

#8997480.1(163106.002)

allow them to accept similar independent contractor positions with other mental health service organizations.  Plaintiff Leffler, in fact, <u>voluntarily</u> requested a change from full-time employment (during which she was not free to establish her own schedule nor work for other service providers during normal working hours) yet ironically, now claims that she should be deemed to be an employee despite her conscious decision based on her desire to control her own professional schedule and reduce her hours of employment.  Plaintiff Merryman also practiced not only with Creative, but with other service providers – and had the kind of flexibility that simply was not available were he a full-time employee of Creative.  Yet he too, wishes to assert the fiction that he was an employee despite the fact that his ability to work with other service providers was possible only because of the flexibility given to him by his chosen independent contractor status.  Ironically, were the Plaintiffs full-time employees, they would be exempted from coverage under the FLSA as they are "learned professionals" with advanced degrees and special skills.  Thus, this case asks the Court to construct for them a fictional status contrary to the status they consciously chose, and one which is the industry standard while disregarding the fact that were they indeed full-time employees, they would not be eligible to assert claims under the FLSA.

The Independent Contractor Agreements executed by each of the two named Plaintiffs are clear and unambiguous.  The contracts provided for payment on a fee for service basis. While the fees were stated as a rate of pay calculated per hour, it is clear that the "hour" consisted of therapy only and included within that time the chart maintenance and other administrative tests necessary for them to be paid.  There was no ambiguity that each therapist under an Independent Contractor Agreement was:

> required to properly maintain charts and other paperwork as
> required by agency policies and state and federal laws or

2

> regulations, and to provide services in accordance with good
> standards of practice and in accordance with state and federal laws
> and regulations which apply to said services.

Independent Contractor Agreement (Leffler Dep. (Ex. G) at Ex. 12 thereto), ¶ 2; *see also*

Merryman Dep. (Ex. F) at Ex. 3 thereto.

Thus, there can be no legitimate claim that either Plaintiff ever reasonably believed that

the record keeping and audit forms they complain of in the Complaint were not included in the

hourly fee for service agreement set forth in the Independent Contractor Agreements.  Not only

were the Plaintiffs aware of the fact that it was their duty to maintain charts and paperwork

associated with their respective practices, but they also knew why that was the case.  Virtually all

of the client caseload which they assumed was government funded and accordingly, it was

necessary to comply with state and federal law covering the documentation of services provided

in order to obtain the reimbursements necessary to allow the independent contractor therapists to

be paid.  In other words, the paperwork which the Plaintiffs agreed to provide as part of their

duties <u>was for their own benefit and permitted them to be compensated.</u>

As discussed below in greater detail, the gravamen of this action is a claim that

notwithstanding their own personal needs which dictated their choice to be independent

contractors, they in fact were hourly employees who did not receive compensation for the small

amount of paperwork necessary to obtain reimbursements so that they could be paid.  The Third

Circuit in *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376 (3d Cir. 1985) set forth the

applicable "economic realities" test for determining whether an independent contractor was, in

reality, an employee.  Under the standards set forth by the Third Circuit, this is a question of law

for the Court.  While the various factors under the Economic Realities Test will be broken down

in the argument section of this brief, the Third Circuit made it clear that the most important

factor of the test was the "economic dependence" of the Plaintiffs on the exclusive employment

by the Defendant.  In the Court's analysis of this test, the ability of the Plaintiff to set forth his or her own schedule and work for other similar businesses is the most significant determinative factor in the analysis.  Given this ruling, the question before the Court is not difficult – both Leffler and Merryman chose to be independent contractors for the very reason of the flexibility it gave them.  As independent contractors, they both worked for other providers of mental therapy services and considered it important to have the flexibility to set their own schedules.  Moreover, both Leffler and Merryman were highly trained skilled professionals who determined <u>on their own</u> the method of therapy to be used in their practice.  The "economic realities" test clearly warrants the conclusion that both Leffler and Merryman were, in fact, independent contractors whose contracts unambiguously required them to perform the relatively minimal amount of paperwork as part of their overall professional duties for which they were compensated.

Leffler and Merryman also raise the question of retaliation.  This, of course, presumes that they are covered employees, which they are not.[2]  Even assuming coverage under the FLSA, no good faith retaliation claim exists here.  With respect to Merryman, however, the claim is frivolous, as no retaliation is alleged to have taken place nor did take place with respect to Merryman.  Count II of the Amended Complaint merely states that "Defendant knowingly and willingly violated this section by terminating Plaintiff Leffler's employment because she asserted her rights . . . under the FLSA."  Amended Complaint, ¶ 73.  Merryman, on the other hand, simply chose to move his practice to another provider where he already was providing services as an independent contractor.  As to Leffler, the record is clear that she, in an email sent to Creative professional staff, compared Defendant Trentacoste, the CEO of Creative, with her violent adjudicated domestic abuse patients.  There is no dispute that Leffler sent out that email, which constitutes (to put it mildly) "gross insubordination."  The assertion of FLSA claims does

---

[2] *See, Marcotte v. City of Rochester*, 2017 WL 392013 (2d Cir. 2017) (at *2).

not permit an independent contractor such as Leffler to be grossly insubordinate and equate her superior of criminality and abuse.  Thus, the claim of retaliation also is without merit.

The remaining allegations of the Complaint are state law claims which, with the dismissal of the federal claims, should be dismissed for lack of subject matter jurisdiction.  If they are considered, they lack any merit whatsoever.  The claims under the Pennsylvania Minimum Wage Act, which are purely conclusory, fail for the same reasons as does the FLSA claims.  In addition, there has never been an allegation that Plaintiffs were compensated at less than the minimum wage of $7.25 per hour and the alleged paperwork of which they complain nowhere has been alleged or shown to require the number of hours which it would have required to reduce the effective wages of the Plaintiffs from $26 to $7.25.  The Pennsylvania Wage Payment and Collection Act ("WPCL") does not give a Plaintiff a claim for relief absent the breach of an underlying contract.  There is no claim for breach of contract in the Complaint and no allegation that any aspect of the Independent Contractor Agreement was breached.  Thus, as a matter of law, no claim lies under the Wage Payment and Collection Law.  The remaining counts for an accounting, conversion and a non-existent statutory claim under the WPCL for failure to keep record all fail to state claims for relief as well.  Finally, the claims against the individual defendants have never been articulated in any manner and simply appear to be alleged for in *terrorem* effect.  Those claims too should be dismissed.

## II.    <u>STATEMENT OF FACTS</u>

### A.    <u>The Parties</u>

Defendant Creative is a not-for-profit and mental health social services and government-funded agency based in Pottstown, Pennsylvania, providing psychiatric and psychological

#8997480.1(163106.002)

evaluations, medication checks, and individual outpatient[3] therapy, among other services. "Program Service Description," Ex. A, # 3 (CHS 1399).  Among other services, Creative provides outpatient counseling, psychotherapy and medication management services to more than 5,000 adults, children and families annually, including low income residents of Berks, Chester, Montgomery and other southeastern Pennsylvania counties.  Schedule 'O' to Form 990 (CHS2260), Ex. C, Part I, Line 1.

Defendant Andrew Trentacoste ("Trentacoste") is Creative's Chief Executive Officer. Defendant Kathy Kumitis ("Kumitis") is Creative's Chief Operating Officer.  Defendant Timothy Alleva ("Alleva") is Creative's Director of Human Resources.  Defendant Karen Becker ("Becker") is Creative's Director of Outpatient Services.  Plaintiff Audrey Leffler ("Leffler"), worked for Creative from 1990 until June of 2015 as a fee for service outpatient therapist.  *See* Defs.' Statement of Undisputed Material Facts (hereafter "Defs.' SMF") (filed concurrently herewith), ¶¶ 3-7 and citations therein.  Unlike Leffler, plaintiff Mark Merryman ("Merryman") – who was affiliated with Creative from 2007 until August of 2016 – began work as an intern, became an independent contractor in May 2008, and was not qualified to perform a full array of services to clients on Medicare until he became a Licensed Clinical Social Worker in June of 2011.  Merryman Dep., Ex. F, at 13:17-20, 47:11-21.

**B.**   **Leffler's Employment at Creative**

Leffler is a clinical therapist having worked at Creative from 1990 to 2015 in various positions.  Leffler Dep. (Ex. G) at Ex. 1 thereto.  During her tenure, Leffler started as an independent contractor, became a full time employee, and, in 2014, at her choosing returned to

---

[3] As Creative's CEO testified, "When we're talking about outpatient services, it's by far the largest department of any behavioral health center and certainly true of Creative Health, thousands of people [patients/clients]." Transcript of Trentacoste Deposition (hereafter "Trentacoste Dep."), Ex. B, at 268:16-20, *see also id.* at 301:1-3 ("The largest number of [independent] contractors by far is in outpatient service because the demand is highest there.").

6

independent contractor status.  *See* Defs.' SMF, ¶¶ 11-13m 17-19 and citations therein.  While Leffler was an independent contractor with Creative, she was simultaneously working for Northwestern Human Services of Montgomery County and continued that position from 1997 to 2001.  Leffler Dep., Ex. G, at 9:15 – 31:6 and Ex. 1 thereto.  Leffler also had another therapist position with Bornemann Psychiatric Associates from 2002 to 2007.  *Id.* at 33:8-23.

In 2007, Leffler voluntarily changed her status to a full-time employee in order to obtain benefits and, "I wanted to work in the children's program. I advocated for that. And Andy [Trentacoste] had – my understanding was that Andy had gotten a grant for it."  Leffler Dep., Ex. G, at 79:1-5.  Leffler's salary changed to $38,500 whereas previously, as an independent contractor, including her other position with Bornemann, she had been grossing about $30,000.  *Id.* at 81:3-15.  A job description of Leffler's functions was identified as Leffler Dep., Ex. # 4.  *Id.* at 81:22 – 84:20.  Leffler was one of the only therapists to split her time between outpatient mental health care and the SAFE program, the acronym for Creative's Stop Abuse Foster Empowerment Program.  As a full-time employee of Creative, Leffler was unable to work at other facilities.

In March 2013, the director of the SAFE Program, Chuck Gallum, suddenly passed away.  Leffler, had a close relationship with Mr. Gallum and was admittedly impacted by her grief.  Leffler Dep., Ex. G, at 133:17 – 135:10.  Leffler became the clinical supervisor for the SAFE Program but was required to report to Jena Stolzfus, despite Leffler's assessment that she (Leffler) possessed superior experience and expertise in the program.  *Id.* at 93:10 – 94:16.  With the passing of Mr. Gallum, Leffler's direct report became Karen Becker. Notwithstanding Leffler's skills as a therapist, absent the protective shield of Mr. Gallum, Leffler's administrative deficiencies and lack of organization surfaced.  As outlined in Defendants' Statement of

Undisputed Material Facts filed herewith, the record is replete with instances of Leffler being found in violation of Creative Health's policies and procedures which apply to all mental health therapists.  Leffler was subject to a number of criticisms in her performance reviews and found excuses or blamed others for each of her documented shortcomings.  *See* Defs.' SMF, ¶ 16 (A-K) and citations therein.

On February 25, 2014, Leffler decided to make the switch back to being an independent contractor.  Leffler Dep., Ex. G, at 155:7-24.  She wanted more flexible hours and, in part, the decision was because of the write-ups and perceived "rudeness" from Becker, Kumitis and Alleva.  *Id.* at 156:4-22.  As an independent contractor, Leffler felt she would be less micromanaged.  *Id.* at 162:11-19.  In her resignation letter as a full time employee, Leffler stated she wanted to "lessen her caseload" in mental health outpatient services, but wanted to continue as the Clinical Supervisor in the SAFE Program.  Leffler Dep. (Ex. G) at Ex. 11 thereto.

Leffler entered into two new Independent Contractor Agreements on March 17, 2014. The March 2014 agreements provided for an hourly rate of $26 for the SAFE Program and $25.50 for out-patient services. Each contract contained a similar provision regarding the requirement to maintain proper charts and paperwork as required by the company and to comply with all state and federal laws. The failure to maintain proper charts would preclude billing for services.  Leffler Dep., Ex. G, at Exs. 12 and 13, ¶ 7.  Among other tasks to be performed were the initial assessments, development of a treatment plan and attendance at clinical supervision and/or team meetings and maintenance of licensure.  Leffler Dep., Ex. G, at Ex. 15.  In addition to the flexibility to control her schedule, as an independent contractor, Leffler was able to itemize certain expenses and write them off against her income. Leffler Dep., Ex. G, at 201:4-14, 202:18-206:12.  In reference to her home office expense, the work-related usage was both for her

8

Creative related activities and those which she performed for other agencies using her training in animal therapy.  *Id.* at 206:13-208:17.

      **C.**    **Merryman's History at Creative**

      While at Creative, Merryman earned a Master's in Social Services from Bryn Mawr College and completed 3000 hours of clinical supervision to earn LCSW, licensed clinical social worker designation.  Merryman Dep., Ex. F, at Ex. 1 and 38:2-20.  Merryman is currently employed at Center for Allied Psychiatry and Psychological Services ("CAPPS") with whom he began working in November 2015 while simultaneously employed by Creative, transitioning from one agency to another. *Id*. at 12:1-15:3.  Merryman provides similar services for CAPPS as an independent contractor, outpatient therapist as he did for Creative, only CAPPS does not accept Medicare clients.  *Id*. at 15:4-15.

      Merryman executed Creative's standard Independent Contractor Agreement on May 5, 2008.  Merryman Dep. (Ex. F) at Ex. 3 thereto.  The contract provides that Merryman was "required to properly maintain charts and other paperwork as required by agency polices and law or regulations."  Merryman Dep., Ex. F, at Ex. 3, ¶ 2. Merryman understood this requirement to relate to the proper preparation of patent charts which is detailed in the audit tool which is at the heart of this action.  Merryman Dep., Ex. F, at 92:3-22.  The contract provided that Merryman would work no more than 35 hours and he controlled the actual number of hours he worked each week noting that, "There are some therapists that only worked one hour per week." *Id.* at 93:16-94:3.  Merryman set his own hours and, until 2012, worked five days a week – after which time he worked at Creative four days and at CAPPS one day per week.  *Id.* at 98:9-23.  Unlike Leffler, Merryman never asked Creative to change his status from that of an independent contractor to an employee.  Merryman Dep., Ex. F, at 88-90.

9

D.     **The Independent Contractor Agreements**

Throughout their terms of employment, Leffler and Merryman had each signed various versions of Creative's standard fee-for-service Independent Contractor Agreement (collectively, the "ICA"). While the rate of compensation in the ICA increased over time, the bulk of the remaining substantive provisions have been identical for much of the last 20 years. As an independent contractor, Leffler executed a contract dated July 1, 1997. The Agreement describes Leffler's compensation, noting, "As discussed, your reimbursement rate will be [$]17 per hour on a fee-for-service basis. For HMO clients the rate will be 19 per hour on a fee-for-service basis." Ex. 2 to Leffler Dep. (Ex. G). The Agreement clarifies that the fee-for-service component is in reference to the sessions for which Creative receives reimbursement and that encompassed in that session time is the understanding that other professional requirements must be met. Specifically, the Agreement provides:

> a.  Your responsibilities will include proper chart maintenance in accordance with agency polices, regular contact with the Out-Patient Director, the Medical Director, and the Clinical Supervisor. Also included is clinical supervision as needed.
>
> b.  Contractor will be expected to bill for services and complete appropriate paperwork in order to receive wages. Billable services include *face-to-face contacts, county collaterals*. Unauthorized visits include: *No authorizations from Ins. Company.*  [Italics signify handwritten insertions.]

Leffler Dep., Ex. G, at Ex. 2, ¶¶ 2, 6; *see also* Contractor Agreement (Ex. K hereto), ¶ 2. Chart maintenance included notes of treatment plans and face-to-face interactions in a particular session which would be reviewed by the director. Leffler Dep., Ex. G, at 39:14- 41:15.

In 2001, Leffler's rate of reimbursement increased and was documented in a new agreement. The revised agreement also made reference to the requirement to properly maintain charts in accordance with agency policies. The contract further specified services for billing.

> 7.     Contractor will bill for services and complete appropriate paperwork. Billable services include:

> *All authorized Treatment*
>
> Unauthorized visits include: *Paperwork; File Maint; non County*
> *collateral unless approved by Director for a funded Program.*
>
> [Italics indicates handwritten insertions]

Leffler Dep. Ex. 3 (Ex. G hereto).  As an independent contractor, invoices would be submitted to Creative using a form prepared by Creative.  Not all independent contractors used the same form. Leffler Dep., Ex. G, at 68:4-16.

Leffler's Independent Contractor Agreement dated March 17, 2014, again stated in paragraph 2, "Contractor is required to properly maintain charts and other paperwork as required by agency policies and state and federal laws or regulations[.]" Leffler Dep., Ex. G, at Ex. 12, ¶ 2.  In almost identical fashion, the Independent Contractor Agreement for Plaintiff Merryman states, "Contractor is required to properly maintain charts and other paperwork as required by agency policies and law or regulations."  Ex. 3 to Merryman Dep. (Ex. F), ¶ 2.  Merryman admitted at his deposition that he understood these duties were part of his contractual obligations.  Merryman Dep., Ex. F, at 117-118.  Similar contractual provisions are described in Defendants' Statement of Undisputed Material Facts, ¶¶ 34-36.  In sum, the Plaintiffs expressly agreed that the paperwork associated with outpatient therapy and other therapy sessions were included in the fee for service rate paid by Creative.  *See* Leffler Dep. (Ex. G), at Exs. 2 and 3 thereto, ¶ 2.

### E.    Creative's Audit Tool and November 2014 Meeting

Creative was required by the Commonwealth of Pennsylvania and/or its various counties to conduct and submit a sampling of audits of patient files.  *See* Merryman Deposition Ex. 4 (Ex. F hereto).  In addition, Medicare and all the other third party payors to whom Creative submits invoices requires to the agency to audit "at a minimum, percentages" of Creative's client's files. Trentacoste Dep., Ex. B, at 177:2-5; *see also id.* at 230:2-7 (internal audits are required by

11

Medicare and "all payer sources").  As such, in 2014, a new audit tool was put into place by

Creative, which in turn was required for Creative's licensure and ultimately payment.  Leffler

Dep., Ex. G, at 215:20-216:26.  Each therapist was required to audit 20% of their case files each

month.  *Id*. at 211:23-212:3.  Creative's internal audit tool was implemented to assist therapists

in ensuring that their files were in compliance with applicable regulations.  *See* Trentacoste Dep.,

Ex. B, at 121:18 – 128:9 (testifying that the audit tool is "protective in nature"); *see also*

Merryman Dep. Ex. 4 (Ex. F hereto).

It has been estimated that, after a therapist's first time doing an audit for a particular

client's file (which may take 20 to 30 minutes), each audit tool takes "five to ten minutes per

case at most once you get the hang of it."  Trentacoste Dep., Ex. B, at 191:6-20; see also id. at

177:21 – 178:2 ("As an ongoing practice, zero to five [minutes] per case.").  Even though

estimates of the exact time to complete the audit tool vary, Merryman admitted at his deposition

that when a second audit is required for the same client, due to certain information remaining the

same and a smaller amount of new material being required, it takes less time.  In fact, he referred

to it as being redundant.  Merryman Dep., Ex. F, at 198-200.

Leffler acknowledged the length of time it required to complete an audit was dependent

upon a number of factors.  Clients who had only been with Creative for a short duration will

have smaller files to audit.  Leffler Dep., Ex. G, at 226:15-19, 227:21-228:5.  If the therapist is

diligent and knows their file that too will shorten the time required to verify that they have been

doing their own work.  In some files, but not many, there may be more than one therapist or

department involved.  That may add time.  The estimates varied.  According to Leffler, "it would

take 20 minutes to a half an hour, you know, if everything was there obviously it would be less

time."  *Id.* at 237:21-238:2.

When questioned about the actual number of audits Merryman performed since 2013, counsel improperly instructed him not to answer.  Merryman Dep., Ex. F, at 209:10-18 (instruction not to answer).  Merryman would not even state if he performed more or less than 50 audits in 2016.  *Id.* at 208:17-21.  The reason for not permitting the answer is because in 2016, Merryman did not complete <u>one</u> audit.  In 2015, he did 16 audits the entire year.  Declaration of Kathy Kumitis ("Kumitis Decl.") (appended hereto), ¶ 7.  In 2014, Merryman completed 19 audits from January through September.  On October 2, 2014, Merryman filled out 5 audits and, on October 3, he submitted **28** audits – all with the same date.  Kumitis Decl., ¶ 5.  In 2013, Merryman performed a total of 5 audits.  Kumitis Decl., ¶ 4.  If the audits required at least an hour as Merryman professed, either he was falsifying the audits or exaggerating the time requirement.

In November, 2014, Merryman requested a meeting with his supervisor, Karen Becker.  Unbeknownst to Ms. Becker, Merryman "corralled" a group of therapists to also attend the meeting. Merryman Dep., Ex. F, at 168:5-8, 180:22-181:3.  Merryman circulated a private agenda for presentation and Becker did not learn of the other invitees until the day before the meeting. *Id.* at 233:18-24.  Upon learning that Merryman had opened what she thought was a private meeting, Becker made sure all interested independent contractors were informed, but still only eight therapists showed up for the meeting.  A copy of the secret agenda which was primarily seeking an increase in pay was present and Becker requested a copy.  Becker Dep., Ex. H, at 168:18 – 179:1 and Ex. 1 thereto; Merryman Dep. (Ex. F), at Ex. 6 thereto; Leffler Dep. (Ex. G), at Ex. 24 thereto.  The aftermath of the November 2014 meeting is described in Defendants' Statement of Undisputed Material Facts (¶¶ 56-57 and citations therein), which is incorporated herein by reference.

### F.      May 2015 Meeting with CEO and New Rate Sheet

In May of 2015, in response to the request for a rate increase, Dr. Trentacoste held a meeting with the outpatient independent contractors.  Dr. Trentacoste circulated a memo outlining the new procedures for maintaining or becoming an independent contractor within the outpatient services department.  Leffler Dep., Ex. G, at Ex. 27.  As such, effective July 1, 2015 and in response to the complaints of Leffler and Merryman, Creative implemented a new rate sheet for its mental health outpatient therapists which included quarterly payments for completion of audits.  *See* Rate Sheet, Ex. 1 to Trentacoste Dep. (attached hereto as Ex. B). Pursuant to the July 1, 2015 rate sheet, Creative's payments to its therapists continued to be tied to the CPT codes used, with an additional lump sum payment – flat fees ranging from $60 to $100 per quarter, based on the number of audits completed.  *See* Trentacoste Dep., Ex. B, at 164:4 – 165:7 and Rate Sheet (Ex. 1 thereto).  These adjustments were implemented and no further complaints from independent contractor therapists have been brought forth.  *Id.* at 284:11-24.

### G.      Termination of Leffler

After the May 2015 meeting, Leffler sent an email which compared Dr. Trentacoste to "the men in her [therapy] group," which at that time exclusively comprised adjudicated domestic violence offenders, by stating, "I deal with this type of behavior two times per week in the domestic violence group."  Leffler Dep., Ex. G, at 319:18-320:8 and Ex. 28 thereto.  The analogy Leffler was making was equating Dr. Trentacoste to her domestic violent group, the same individuals for whom she complained she need security protection.  Id. at 320:9-19, 159:8-19.

A trained therapist equating the CEO of Creative to those who commit domestic violence, in an email circulated to other professionals, was considered a serious violation of professional standards.  This type of behavior where one trained professional circulates reckless

14

characterizations and defamatory labels of another professional was inconsistent with Creative's policies.  Trentacoste determined that it was appropriate to dismiss Leffler and her employment was terminated on June 10, 2015.  Trentacoste Dep., Ex. B, at 287:17 – 291:19 ("She's essentially accusing me of being a domestic violence perpetrator. And you put it in that context and it . . . [was] something that needed to be addressed."), 293:5-9 ("I work in a system that is predominantly female and being described as a leader, who happens to be a male, as a domestic violence perpetrator is incredibly problematic to Creative Health"); see also Merryman Dep., Ex. F, at 176-177 (stating that Leffler told him she was fired as a result of the contents of the email she sent).

### H.   Resignation of Merryman

Unlike Leffler, who was terminated with cause, Merryman voluntarily resigned from Creative effective August 29, 2016.  Merryman Dep. (Ex. F) at Ex. 11 thereto.  In contrast, when Merryman resigned from Creative in August, 2016, Becker offered him another position at Creative, which he declined.  Merryman Dep., Ex. F, at 321.  Merryman's August 8, 2016 resignation letter stated, "I do appreciate the opportunity to be part of such a dynamic community and realize I have achieved my dream of helping people . . . Creative Health played such a major role in helping me get to where I am now."  Merryman Dep. Ex. 11 (Ex. F hereto).

Prior to his departure, Merryman made plans for the placement of his clients.  His new employer, CAPPS did  not accept medical assistance, so a transition was necessary. Other clients transferred to CAPPS and continued treatment with Merryman. Merryman Dep., Ex. F, at 114:19-117:8.  During his tenure, his rate of pay increased from its original $25 per hour to $35 per hour with several increments over time. (*Id.* at 125:16-128:11).  Although Merryman claims that his requests for increases to his supervisor, Karen Becker, "fell on deaf ears" (*id.* at 128:22-

129:4), he utilized his pay increase to negotiate a higher rate with CAPPS which initially offered

him $28 per hour. (*Id.* at 130:20- 131:13).

## III.   STATEMENT OF QUESTIONS INVOLVED

    A.    Whether Leffler and Merryman may be deemed to be employees rather than independent contractors under the "Economic Realities Test" set forth in *Donovan v. DialAmerica Marketing, Inc*., 757 F.2d 1376 (3d Cir. 1985)?

*Suggested Answer:*    No.

    B.    Does the record permit Creative to terminate its relationship with Leffler on grounds of gross insubordination for comparing Creative's CEO to "the men in her [therapy] group" which at the time of the email consisted solely of men who had been adjudicated as domestic violence offenders.

*Suggested Answer:*    Yes.

    C.    Is there any record evidence to support Merryman's claim of retaliatory discharge under the FLSA?

*Suggested Answer:*    No.

    D.    Is there any record to support a claim of a violation of the Pennsylvania Minimum Wage Act?

*Suggested Answer:*    No.

    E.    Is there any record evidence to support Plaintiffs' claims arising under the Wage Payment and Collection Law?

*Suggested Answer:*    No.

    F.    Is there any record evidence to support the claims for conversion, the right to an accounting for alleged statutory recordkeeping claims?

*Suggested Answer:*    No.

## IV.   SUMMARY OF ARGUMENT

    While Plaintiffs have asserted eight claims, all but the FLSA claims are legally frivolous,

as are the claims against the individual Defendants.  With respect to the Plaintiffs' primary claim

for unpaid wages under the FLSA, such a claim depends upon their classification as employees

rather than independent contractors, since independent contractors are not covered under the

FLSA or ERISA.  Under the "Economic Realities Test" set forth by the Third Circuit in *DialAmerica* and its progeny, the key factors pertain to the degree of control exercised by the Defendant over the Plaintiff and the economic dependence of the Plaintiff on the Defendant.  In this case, the record is clear – both Plaintiffs, who are highly trained therapists, consciously chose to be independent contractors because of the flexibility it gave them to control their own schedules and the flexibility to work for other providers.  They also were both highly trained therapists with unique skills and controlled the manner of therapy they offered to patients. Indeed, the evidence is overwhelming in this case that both Plaintiffs were, in fact, independent contractors not subject to the FLSA.

There also is no dispute that there has been no retaliation against Merryman of any kind and the termination of Leffler occurred only after she circulated an email to other professionals at Creative comparing Creative's CEO to adjudicated domestic violence offenders.   No company is required to permit that kind of gross insubordination and the record demonstrates that it was not retaliation but rather, a termination for cause.

The remaining claims are without merit under the law inasmuch as there is no allegation nor could there be any allegation that Plaintiffs were not paid in excess of the minimum wage, there is no allegation of a breach of contract required to support a Wage Payment and Collection Law claim, and the conversion, accounting and statutory record keeping claims are frivolous as a matter of law.  In addition, there is no cognizable claim against any of the individual Defendants.

V.    **ARGUMENT**

A.    **Standards For This Motion**

Pursuant to Rule 56a of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In reaching this decision, the Court must

17

determine "whether the pleadings, depositions, answers to interrogatories, admissions on file and

affidavits show that there is no genuine issue of material fact and whether the movant party is

therefore entitled to judgment as a matter of law. *MacFarlan v. Ivy Hill SNF, LLC,* 675 F.3d

266, 271 (3d Cir. 2012), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A disputed

issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder

could find for the non-moving party.  *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.

2006), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A factual dispute is

"material" only if it might affect the outcome of suit under governing law.  *Doe v. Luzerne Co.,*

660 F.3d 169, 173 (3d Cir. 2011).  The Court's task is not to resolve disputed issues of fact, but

to determine whether there exists any factual issues to be tried.  *Anderson v. Liberty Lobby,*

*supra* at 247-249.

  In deciding a motion for summary judgment, the Court must view the evidence and all

reasonable inferences from the evidence in the light most favorable to the non-moving party.

*MacFarlan, supra,* 675 F.3d at 271; *Bouriez v. Carnegie Mellon University,* 585 F.3d 765, 770

(3d Cir. 2009).  If there is no factual issue and only one reasonable conclusion could arise from

the record regarding the potential outcome under governing law, summary judgment must be

awarded in favor of the moving party.  *Anderson v. Liberty Lobby, supra* at 250.

  The moving party bears the burden to prove that if the evidentiary material of record will

reduce to admissible evidence in Court, it would be insufficient to permit the non-moving party

to carry its burden of proof.  *Celotex Corp. v. Catrett, supra* at 322-23.  Once the moving party

meets its initial burden, the burden then shifts to the non-movant, who must set forth specific

facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations,

unsupported assertions or denials of its pleadings.  *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d

Cir. 2001).  In other words, "the non-moving party must go beyond the pleadings and by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial.  *Ivan v. County of Middlesex,* 595 F.Supp. 2d 425, 427 (D.N.J. 2009), *citing Celotex, supra*, 477 U.S. at 324.  Conclusory statements, general denials and factual allegations not based on personal knowledge are insufficient to avoid summary judgment.  *Olympic Junior Inc. v. David Crystal, Inc.* 463 F.2d 1141, 1146 (3d Cir. 1974).

Of particular import in this case is the fact that the determination of whether an individual should be classified as an employee for the purposes of the Fair Labor Standards Act is a question of law for the Court.  *Atkins v. Capri Trading Center, Inc.,* 2014 WL 4930906 (D.N.J. 2014) (at *7); *Todaro v. Township of Union,* 27 F.Supp. 2d 517, 533 (D.N.J. 1998).

Because the record in this case overwhelmingly supports the conclusion that both of the named Plaintiffs were, in fact and in law, independent contractors not subject to the Fair Labor Standards Act, and because the state law claims are wholly without merit, summary judgment must be entered in favor of the Defendants.

### B.    Both Leffler And Merryman Are Independent Contractors And Not Eligible To Assert Claims Under The FLSA

It is well settled that independent contractors are not covered under the FLSA. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728 (1947).  *Also see, e.g., Chao v. Mid-Atlantic Installation Services, Inc.,* 16 Fed. Appx. 104, 105 (4th Cir. 2001); *Bamgbose v. Delta-T Group, Inc.,* 684 F.Supp. 2d 660, 668-69 (E.D.Pa. 2010); *Safarian v. American DG Energy, Inc.,* 2015 WL 12698441 (D.N.J. 2015) (at *3).  As noted previously, the question of whether an FLSA Plaintiff is independent contractor or an employee is a question of law for the Court. *Todaro v. Township of Union, supra,* 27 F.Supp. 2d at 533; *Atkins v. Capri Training Center, Inc., supra*, 2014 WL 4930906 at *7.

#8997480.1(163106.002)

In several cases, the Third Circuit has elucidated the standard of the "economic realities test" to determine whether an independent contractor, in reality, is an employee subject to the FLSA.  The criteria developed by the Third Circuit, are (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment of materials required for his task, or his employment of helpers; (4) whether the service requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business.  *Martin v. Selker Brothers, Inc.,* 949 F.2d 1286, 1293 (3d Cir. 1991).  Furthermore, the Court should consider whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service.  *Donovan v. DialAmerica Marketing, Inc., supra*, 757 F.2d at 1382-83.

### 1.      <u>Degree of Employer's Control</u>:

Evidence relevant for the evaluation of the first factor of the "economic realities" test include the degree of supervision over the worker, control over the worker's schedule and instruction as to how the worker is to perform his or her duties.  *Donovan, supra*, 757 F.2d at 1383-84; *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675-76 (1st Cir. 1998); *Bamgbose v. Delta-T Group, Inc., supra*, 684 F.Supp.2d at 669.  Here, the evidence is uncontradicted that the most significant reason for both Plaintiffs' decision to choose status as independent contractor was so that they had flexibility in controlling their schedule, including both the number of hours they would work as well as the ability to work with other providers and mental health services.

Under the Independent Contractor Agreements with both Leffler and Merryman, they were free to work as little as zero hours per week, and client assignments would only be made

once the Plaintiffs provided Creative with their availability.  Merryman Dep. (Ex. F) at Ex. 3

thereto, ¶ 4.  Once a client was assigned, it was exclusively in the control of the therapist to set

the time for an appointment.  *See id*.  Thereafter, the plan of treatment for each client was solely

determined by the Plaintiffs in their independent professional judgment and was not dictated by

Creative.  Leffler Dep. Ex. 13, ¶4.  The treatment plans and progress were reviewed by a

psychiatrist but the course of treatment and implementation was in the exclusive hands of the

therapist.  Indeed, Leffler utilized unorthodox treatment methods, including the use of pets, and

she developed the treatment procedure in the stop abuse foster and empowerment ("SAFE")

program for children in domestic violence situations.  Leffler Dep. (Ex. G) at 51:10-54:16.

Merryman acknowledged that he was responsible for designing treatment plans for his patients.

Merryman Dep. at p. 60:6-21.  Leffler, who was a full-time employee with Creative from 2007 –

2014, voluntarily made the switch back to being an independent contractor because she wanted

more flexible hours and felt she would be "less micro-managed" in that status.  Leffler Dep. at p.

155:7-24; 162:11-19.  Neither Merryman nor Leffler were committed to any set schedule as

independent contractors and both of them worked for other providers while in that status; Leffler

with Northwestern Human Services of Montgomery County and Bornemann Psychiatric

Associates (Leffler Dep. at p. 9:15-31; 33:8-23) and Merryman with Center for Allied Psychiatry

and Psychological Services (Merryman Dep. at 12:1-15:3).  This, of course, was not possible if

either Plaintiff was employed full-time and thus committed to Creative during all weekday

working hours.  Accordingly, Leffler did not work for any other providers during the period of

time she was a full-time employee of Creative.  Leffler Dep. at 81:3-15 (testifying that a reason

she took full-time status is that it paid more than her then-separate positions as independent

contractor with Creative and Bornemann).

Accordingly, the control factor weighs strongly in favor of the Plaintiffs' status as independent contractors.  *See, Safarin v. American DG Energy, Inc., supra*, 2015 WL 12698441 at *3 (Where the plaintiff works independently, it suggests the defendant did not have the right to control the manner in which plaintiff's work was performed and weighs in favor of finding that the plaintiff was an independent contractor.).

### 2.    Opportunity for Profit or Loss:

The second criterion centers on whether Plaintiff had meaningful opportunities for profit or any significant risk of financial loss, depending on his managerial skill.  *Martin, supra*, 949 F.2d at 1294.  Significantly, the receipt of a fixed commission or regular salary of a set amount indicates an employer-employee relationship, where as a worker who is paid per project may be considered an independent contractor.  *Safarin, supra* at *4; *Luxama v. Ironbound Exp., Inc.,* 2012 WL 5973277, at *5 (D.N.J. 2012).  Where, as here, the plaintiff is not paid a set salary and has the opportunity to take on more work to make a larger profit, this indicates that the plaintiff has a meaningful opportunity for profit or loss and weighs in favor of finding that the plaintiff was an independent contractor.  *Safarin, supra* at *4.  As neither Merryman nor Leffler had **any** set commitment of time under their Independent Contractor Agreements, and could work as little or as much as they chose, this element too overwhelmingly weighs in favor of finding that they were, in fact, independent contractors.

### 3.    Investment in Equipment or Materials or Employment of Helpers:

This factor considers "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers."  *Luxama, supra*, 2012 WL 5973277 at *18. Both Plaintiffs were therapists whose work involved little in the way of equipment or materials. However, the Plaintiffs were required, at their own expense, to maintain their license status, provide professional liability insurance and participate in continuing professional education.  See

22

Merryman Dep. (Ex. F), at Ex. 3 thereto, p. 3 ("Duties and Responsibilities").  In Leffler's

circumstance, she provided the dogs and other related items in order to provide animal assisted

therapy.  Both Leffler and Merryman deducted expenses as reflected on the Schedule C of their

tax returns for supplies and the use of their private home as offices.  The Plaintiffs were solely

responsible for developing their own treatment plan and providing whatever materials are

necessary, if any.  While this factor is not significant given the fact it is not a profession

requiring "equipment and materials", to the extent it is relevant, it too weighs in favor of

independent contractor status.

### 4.     Special Skill:

Both Plaintiffs were highly trained mental health therapists with masters degrees and

special licenses to practice therapy.  Leffler holds a Masters and holds several specialized

therapy certificates in hypnotherapy and animal therapy as well as other related certifications set

forth in her curriculum vitae.  Leffler Dep. (Ex. G) at 22:9-25:21 and Ex. 1 thereto.  Merryman

has a Masters in social services from Bryn Mawr College and completed 3000 hours of clinical

supervision to earn designation as a licensed clinical social work designation.  He also has a

certification in cognitive behavioral therapy.  Merryman Dep. (Ex. F), at 38:2-20 and Ex 1

thereto.  In this regard, it should be noted that were the Plaintiffs, in fact, full-time employees,

their professional status would deem them to be "learned professionals" exempt from coverage

under the FLSA.  29 U.S.C. §213(a)(1).  To qualify for the learned professional exemption, an

employee's primary duty must be the performance of work requiring advanced knowledge in a

field of science or learning customarily acquired by a prolonged course of specialized intellectual

instruction.  29 C.F.R. §541.301(a).  Mental health therapists with masters degrees are uniformly

deemed to be "learned professionals" under the FLSA.  *Levine v. Unity Health System,* 847

F.Supp. 2d 507, 510-11 (W.D.NY. 2012); *Chatsfield v. Children's Services, Inc.,* 555 F.Supp. 2d 532, 535-36 (E.D.Pa. 2008).

As noted above, there is a certain irony to the claim by two mental health professionals who voluntarily chose to be independent contractors claiming that they should be deemed to be employees notwithstanding the fact that were they actual full-time employees, they would not be subject to the FLSA due to the learned professional exemption.  In any event, however, it is clear that both plaintiffs possess special skills and learning and this factor again weighs heavily in favor of independent contractor status.

<strong>5.       Degree of Permanence:</strong>

This factor looks to the question of whether the worker works for the alleged employer **exclusively** and continuously.  *Safarin, supra* at *5; *Luxama*, supra at *7.  Neither Plaintiff worked exclusively for Creative and both were free as independent contractors to work for other mental health providers and in fact, did so.  Leffler for a period of seven years, chose to be a full-time employee and give up work with other providers and then voluntarily chose to go back to independent contractor status.  Among the reasons provided by Leffler was the desire to reduce her hours and her stress.  [citation]  Merryman used his independent contractor status to commence work at his current employer and transition from one base of operation (Creative to another (CAPPS).  Merryman and Leffler both were free to work as much or as little as they wanted for Creative while simultaneously working for other providers and accordingly, this factor also weighs in favor of independent contractor status.

<strong>6.       Integral Part of the Employer's Business:</strong>

It is not disputed that mental health services are the essential part of Creative's business.  This one factor therefore would weigh in favor of employee status.

24

7.    **Dependence upon the Business:**

The Third Circuit in *DialAmerica* stressed an additional consideration as the most prominent of the factors, i.e., whether the Plaintiffs are "dependent upon the business to which they render service . . . [that is] whether the workers are dependent on a particular business or organization for their continued employment." *DialAmerica, supra*, 757 F.2d at 1385.  A worker "with numerous options for employment in the particular field at issue," is therefore "not economically dependent on a single employer." *Krause v. Cherry Hill Fire District* 13, 969 F.Supp. 270, 275 (D.N.J. 1997).  As held in *DialAmerica*, "dependent" does not mean "whether the workers at issue depend on the money they earn for obtaining the necessities of life . . . but [r]ather . . . whether the workers are dependent on a particular business or organization for their continued employment" or are "in a position to offer their services to many different businesses or organizations." *DialAmerica, supra*, 757 F.2d at 1385-86; *Todaro v. Township of Union, supra*, 27 F.Supp. 2d at 534.

Here, the dependence issue is not at all in dispute.  Neither Plaintiff was ever dependent on Creative in terms of their exclusive employment and were, in fact, "in a position to offer their services to many different businesses or organizations," and in fact did so.  Not only did both work for other organizations during their tenure at Creative but both immediately replaced their employment upon departure.  While Merryman planned his exit, Leffler was terminated and then hired by her current employer immediately thereafter.  They were not, as was the case in DialAmerica, only permitted to work for the Defendant.

Thus, of the factors set forth in the "economic realities test", only one factor, whether therapy services are integral to the business of Creative, weighs in favor of the Plaintiffs.  Each and every other factor makes it clear that the Plaintiffs voluntarily chose independent contractor status precisely for the advantages it gave them, control over their own schedules, the ability to

work for other organizations and the ability to maximize their profits by choosing schedules with

Creative and other providers that offered them the most patient access.  In addition, the Plaintiffs

both are skilled therapists who control their own treatment plans and were subject to minimal

control in any regard.  Accordingly, after a full opportunity for discovery, it is clear that the

Plaintiffs are independent contractors for the purposes of the FLSA and accordingly, are not

covered under that statute.  Accordingly, Counts I and II of the Complaint for violations of the

FLSA must be dismissed.

> **C.      Even Were The Plaintiffs Deemed To Be Employees Under The FLSA, The
> Administrative Work Complained Of Is Not A Ground For A Claim Under
> The FLSA.**

Even if this Court were to decide that notwithstanding the fact that Plaintiffs chose

independent contractor status for the same reasons that the economic realities test would deem

them to be independent contractors, it is settled law that where an employee bargains for a pay

rate that includes administrative paperwork and at least minimum wage is paid, the Court should

not infer that there is no compensation for the paperwork time.  *Hensley v. McMillan Bloedel*

*Containers, Inc.,* 786 F.2d 353, 356-57 (8th Cir. 1986).

The Independent Contractor Agreements signed by the Plaintiffs, both provide

unambiguously that the hourly rate includes all administrative paperwork necessary to permit

Creative to process reimbursement requests from governmental agencies which permits the

Plaintiffs to be paid.  The agreements are not subject to an interpretation that the hourly therapy

rate does not include payment for the chart and audit work but rather, make it clear that such

tasks fall within the hourly rate.  There has been no claim that the necessity of performing

administrative chart work pushes the Plaintiffs' pay rate below the minimum wage - - indeed,

Plaintiffs merely allege it added 10-20 minutes to their work hour, a claim unsubstantiated in

discovery.  Complaint, ¶ 33.  At an hourly rate of $26.00, any claim that the effective rate fell

below $7.25 (requiring four-five times as much work for charts as therapy) are legally frivolous.

Accordingly, the FLSA claims should be dismissed in that there was no violation of the Act even

if Plaintiffs somehow could be deemed to be covered thereunder.

>    **D.**    **The Retaliation Claims Under The FLSA Are Without Merit.**

As noted above, non-covered employees cannot assert a good faith claim under the

FLSA.  *Marcotte v. City of Rochester*, 2017 WL 392013, at *2 (2d Cir. 2017).  To the extent that

Plaintiffs are subject to the FLSA, they have asserted a retaliation claim which as to Merryman is

wholly conclusory, and which as to Leffler, is based on her termination for cause in May of

2015.  With respect to Merryman, the claim is difficult to ascertain, but appears to be based upon

alleged unsubstantial inchoate threats of future threats of future harm.  Dealing with Merryman

first, it is clear that no retaliation claim would lie as he has not alleged any economic injury.

Retaliation claims under the FLSA require "present or foreseeable future economic injury."  The

only act of retaliation Merryman could identify was the service of a subpoena upon his present

employer in this litigation.  *See*, Merryman Dep., Ex. F, at 224:24-225:21.  Creative's use of the

judicial process to defend this claim does not constitute retaliation under the FLSA.  *Davis v.*

*Town of Lake Part*, 245 F.3d 1232, 1240 (11th Cir. 2001).  Plaintiff Merryman alleges no

"adverse employment actions" against him, consisting of a "serious and material change in the

terms, conditions or privileges of employment."  *Vandesande v. Miami-Dade County*, 431

F.Supp. 2d 1245, 1253 (S.D.Fla. 2006).  Merryman left Creative on his own volition and was

offered an opportunity of employment which he declined.  Given that Merryman has not alleged,

nor come forward with evidence supporting any claim of any economic injury or adverse

employment action against him, he clearly lacks any basis for a claim of retaliation.

With respect to Leffler, the standards for a retaliation claim are as follows:  First, the

employee must establish three elements for her *prima facie* case:  (1) the employee engaged in

protected employee activity, (2) there was adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal connection between the protected activity and the employer's adverse action.  If the employee establishes a *prima facie* case*,* the burden shifts to the employer to establish a legitimate, non-retaliatory reason for adverse employment action.  If this burden of production is met, the burden shifts back to the Plaintiff to prove that the alleged reasons preferred by the employee are pretextual and that the employer intentionally retaliated against the Plaintiff.  *Wildi v. Alle-Kiski Medical Center,* 659 F.Supp. 2d 640, 664-65 (W.D. Pa. 2009).  Leffler alleges that she participated in a meeting to discuss various issues including time spent on administrative requirements under her Independent Contractor Agreement.  She was terminated subsequent to that meeting and alleges a causal connection between those two actions.

In response, Creative has demonstrated that Leffler sent an email to other professionals within Creative which compared the CEO of Creative, Trenatacoste to "the men in her [therapy] group," which was comprised exclusively of adjudicated domestic violence offenders.  She stated in that email " I deal with this type of behavior two times per week in the domestic violence group.  It felt like an attempt to maintain power and control over us and our concerns." (Leffler Dep. (Ex. G) at 319:18-320:8 and Ex. 28 thereto).  Leffler acknowledged that the analogy she was making was to her domestic violence group, the same individuals for which she claimed she needed security protection.  Leffler Dep. (Ex. G) at 320:9-19, 159:8-19.  In the words of Trentacoste:

> "She's essentially accusing me of being a domestic violence perpetrator.  When you put it in that context and it - - - [was] something that needed to be addressed." . . . I work in a system that is predominately female and being described as a leader, who happens to be male, as a domestic violence perpetrator is incredibly problematic to Creative Health."

28

Trentacoste Dep. (Ex. B), at 287:17-293:9.

Leffler was terminated as a result of that email communication to Creative staff.  *See* Ex. B at 287:17-291:19; Merryman Dep. (Ex. F), at 176-177.

Insubordination is not protected under the FLSA nor sufficient to trigger the anti-retaliation provisions of the FLSA.  *Zielinski v. City of Wildwood*, 2014 WL 6991388 (D.N.J. 2014) (at *6); *citing, Ritchie v. St. Louis Jewish Light,* 630 F.3d 713, 716-17 (8th Cir. 2011). ("Insubordination is not protected activity under Section 215(a)(3)").  *Bogner v. R&B Systems, Inc.,* 2011 WL 1832750 (E.D. Wash. 2011) (at *5) ("Failing to comply with such a modest adjustment to one's schedule could constitute insubordination and serve as a basis for termination" and would not give rise to a retaliation claim under the FLSA").

Since Creative has provided a legitimate, non-retaliatory reason to rebut the *prima facie* inference of retaliation, namely, that it has articulated a legitimate reason for termination that is supported by the evidence (*Robinson v. Affinia, Inc.,* 815 F.Supp. 2d 935, 943 (W.D. NC 2011), the burden shifts to Plaintiff to prove that the articulated reasons are pretextual.  *Jafari v. Old Dominion Transit Management Co.,* 913 F.Supp. 2d 217, 228 (E.D. Va. 2012).  The Court should note that in reaching the conclusion that the burden shifts back to the Plaintiff at this stage, the Supreme Court has held that "Defendant's burden is low such that it need not persuade the Court that it was actually motivated by the proferred reasons so long as it otherwise articulates a legitimate reason that is supported by the evidence.  *Texas Department of Community Affairs v. Burdine,* 455 U.S. 248, 255 (1981).

The record demonstrates a plethora of reasons why Creative may have chosen to terminate Leffler for inadequate performance long before the offending email, including but not limited to, false timesheets, failure to document required notes of client sessions, failure to

appear for appointments, habitual lateness for meetings, inappropriate language with her

superiors, disorganization and gross violations of policy concerning chart keeping and audit

record keeping.  *See* Defs.' Statement of Material Facts, ¶ 16(A)-(K) and citations therein**.**

However, it was only when Leffler engaged in gross insubordination was she terminated.  As

noted above, insubordination is not protected activity and if the behavior is reasonably construed

from the Plaintiff's behavior by the Court, termination is proper and there can be no retaliation

claim. *Zelinski v. City of Wildwood, supra*.  Here, Leffler openly and in a communication with

the professional staff, not just Trentacoste, compared him to adjudicated domestic violence

abusers.  The email was so unsettling that it was delivered to the Chief Operating Officer of

Creative anonymously by having it slipped under her office door.  Leffler's unprofessional

conduct was simply unacceptable and particularly so in an environment where victims of

domestic abuse are being treated.  Accordingly, no retaliation claim may lie as a matter of law.

**E.       The State Law Claims Are Wholly Without Merit.**

Count III of the Complaint for alleged violations of the Pennsylvania Minimum Wage

Act appears to be little more than a "throw in" claim.  A claim under the Minimum Wage Act is

equivalent to a claim under the Minimum Wage Provisions of the FLSA.  *Jochim v. Jean*

*Madeline Educational Ctr. of Cosmetology, Inc*., 98 F.Supp. 3d 750, 756 (E.D. Pa. 2015)

("[b]ased on the identity of purpose between those two statutes, Pennsylvania Courts employ the

same test used by the Federal Courts and use federal case law to determine the governing

standard [for MWA claims]."  That standard requires an averaging for all work hours to ensure

that the wage exceeds minimum wage.  *See, e.g., Hirst v. Skywest, Inc.,* 2016 WL 2986978 (N.D.

Ill. 2016) (at \*7) (and cases cited therein).

Given the fact that under the Independent Contractor Agreements, the Plaintiffs earned

$26.00 per hour, it would require non-compensated time of a magnitude of at least 4-1 of chart

time to therapy time to state a claim under this theory.  Plaintiff has nowhere alleged nor proven that the administrative tasks took anywhere near the amount of time required to bring either Plaintiffs wages under $7.25 per hour.  Indeed, the Complaint alleges merely that state required audits required an additional "10-20 minutes per patient session to complete."  Complaint, ¶33. While this claim has never been substantiated by the evidentiary record, neither these tasks nor some of the other chores such as reporting child abuse would come close to a magnitude required to bring the Plaintiffs' rate of pay below $7.25 an hour.  Accordingly, the minimum wage claim is legally frivolous and without any meaningful support.

The same is true with the claims under the Pennsylvania Wage Payment and Collection Law.  The Wage Payment and Collection Law does not provide any remedy absent an underlying breach of contract – rather, it is a statutory remedy for failure to pay wages **pursuant to a contract.**  *Lehman v. Legg Mason, Inc.,* 532 F.Supp. 2d 726, 733-34 (M.D. Pa. 2007).  There is no allegation nor record that either Leffler or Merryman was not paid the compensation set forth in their Independent Contractor Agreements.  To the contrary, they claim that they are entitled to compensation **contrary** and in addition to the terms of their contracts.  They claim entitlement to pay for administrative chart and recordkeeping work which the Independent Contractor Agreements unambiguously provide are covered within the hourly rate.  That is precisely why there is no breach of contract claim in the Complaint.  Absent a breach of contract claim, there is no Wage Payment and Collection Law claim.  *Lehman, supra.*  Accordingly, the Wage Payment and Collection Law claim also fails to state a cause of action.

Conversion is defined as the wrongful exercise of dominion and control over property owned by another inconsistent with the owner's rights.  *McAdam v. Dean Witter Reynolds, Inc.,*

31

896 F.2d 750, 771 (3d Cir. 1990); *Gemel Precision Tool Co., Inc. v. Pharma Tool Corp.,* 1995

WL 71243, at *6 (E.D. Pa. 1995).

The failure of a party to a contract to pay the full contract price is simply a breach of

contract and does not constitute a conversion. *Snyder v. Deitz & Watson, Inc.*, 837 F.Supp. 2d

428, 444 at n.8 (D.N.J. 2011). Simply stated, neither Leffler nor Merryman had any interest in

funds of Creative other than those granted under their Independent Contractor Agreements with

Creative. The Independent Contractor Agreements clearly provided that the hourly rate included

the administrative work complained of. Any rights to additional funds are contractual and

accordingly, a conversion claim cannot stand. Moreover, such a claim is barred by the "gist of

the action doctrine" since the success of the conversion claim is wholly dependent upon the

terms of the contract. *Diodato v. Wells Fargo Insurance Services USA, Inc.,* 44 F.Supp. 3d 541,

553 (M.D. Pa. 2014). Accordingly, the conversion claims are wholly without merit.

In Count V, Plaintiffs also seek a legal and equitable accounting, despite the fact there is

no claim for breach of contract nor a fiduciary relationship. Under the law, the right to

accounting requires that:

> 1.      There was a valid contract, express or implied,
> between the parties whereby the defendant (a) received monies as
> agent, trustee or in any other capacity whereby the relationship
> created by the contract imposed a legal obligation upon the
> defendant to account to the plaintiff for monies received by the
> defendant, or (b) if the relationship created by the contract between
> the plaintiff and defendant created a legal duty upon the defendant
> to account and the defendant failed to account and the plaintiff is
> unable, by reason of the defendant's failure to account, to state the
> exact amount due him, and
>
> 2.      That the Defendant breached or was in dereliction
> of his duty under the contract.

*McGough v. Broad Wing Communications, Inc.,* 177 F.Supp. 289, 301 (D.N.J. 2001) (Applying

Pennsylvania law).

No such contract requiring a duty to account exists in this case.  Plaintiffs' contract clearly provided for a payment per hour of therapy services, included in which were the administrative services complained of.  The contract provides no provision for creating a legal obligation to account for monies received by the Defendant.  Accordingly, the legal accounting claim is also without merit.  An equitable accounting claim requires the existence of a fiduciary duty between the parties.  *Binary Semantics, Ltd. V. Minitab, Inc.,* 2008 WL 763575 (M.D. Pa. 2008) (at *13).  No fiduciary duty is alleged to exist here, nor does such a duty flow between mere parties to a contract, whether or not an employee-employer relationship exists absent a "special relationship."  *Wasseff v. Nat'l Institute of Health*, 2017 WL 495795 (E.D. Pa. 2017) (at *12).  Accordingly, the accounting claims also fail.

Plaintiffs' final claim is the alleged failure to keep accurate records under the Wage Payment and Collection Law, 43 Pa. C.S.A. §260.8.  As noted above, Plaintiffs have no claim under the WPCL since there is no allegation that they were not paid all compensation that was due under the plain terms of their contract and, there is no claim for breach of contract in the Complaint.  Even were there such a claim, there is no private right of action under Section 260.8 of the WPCL.  Section 260.8 of the Wage Payment and Collection Law provides that "Every employer shall keep open to inspection by the Secretary [of Labor] . . . all payroll records or other records or documents related to the enforcement of this Act.  Such inspection may be made by the Secretary or his authorized representative at any reasonable time."

The Plaintiffs are not the Secretary of Labor and, in addition to failing to allege any violation of their contract, do not allege any failure to record Plaintiffs therapy sessions to which they were entitled to compensation under their Independent Contractor Agreements.  The civil action provision of the WPCL, 43 P.S. §260.9a limits actions to the right to recover wages.

#8997480.1(163106.002)

There is no civil action which is predicated upon Section 260.8.  Accordingly, Count VII of the Amended Complaint fails to state a cause of action and must be dismissed.

### F.   Count VIII under ERISA Is Frivolous.

Count VIII of the Complaint is a claim for "interference with the attainment of ERISA protected rights."  Fatally for the Named Plaintiffs, ERISA's protections are not, as a matter of law, available to independent contractor plaintiffs.  "[N]umerous courts, including the Third Circuit, have found no ERISA violations where an employer's plan excluded hourly employees, temporary employees and independent contractors."  *Schwartz v. Indep. Blue Cross*, 299 F. Supp. 2d 441, 449 (E.D. Pa. 2003) (citing *Bauer v. Summit Bancorp*, 325 F.3d 155, 160 (3d Cir. 2003); *Edes v. Verizon Comms., Inc.*, 288 F.Supp.2d 55 (D.Mass.2003); *Williams v. American Int'l Group, Inc.*, 2002 WL 31115184 (S.D.N.Y. Sept. 23, 2002) (emphasis added).  For this reason alone, Count VIII must be dismissed.

Alternatively, what this claim is, in essence, is an assertion that contrary to the terms of their written contracts, the two Plaintiffs were "common law employees" under ERISA.  The balancing of factors for this determination are very similar to those of the test under the FLSA and were set forth by the Supreme Court in *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318 (1992).  The factors to be considered are:

> The skill required, the source of instrumentality and tools, the location of the work, the duration of the relationship between the parties, whether the hiring party has the right to assign additional products to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, the hired party's role in hiring and paying assistance, whether the work is part of the regular business of the hiring party, whether the hiring party is in business; the provision of employee benefits and the tax treatment of the hired party.

*Darden, supra* at 323; *Gustavson v. Bell Atlantic Corp.,* 171 F.Supp.2d 311, 320-21 (S.D.N.Y. 2001).

34

As noted above, all of these factors with the exception of the one factor of the "regular business of the hiring party" weighs in favor of Defendants.  Most particularly, both Leffler and Merryman "control the manner and means by which the worker completes his or her assigned task," the factor given greatest emphasis.  *Eisenberg v. Advanced Relocation & Storage, Inc.,* 237 F.3d 111, 114 (2d Cir. 2000).  Of course, Plaintiff has not named any fiduciary or plan as a party to this action and in short, Count VIII of the Complaint also should be dismissed with prejudice.

**VI.**     **CONCLUSION**

For all the reasons set forth herein, it is respectfully submitted that Defendants Motion for Summary Judgment be granted in all respects.

Respectfully submitted,

WILENTZ, GOLDMAN & SPITZER P.A.

Date:  February 22, 2017              BY:     /s/ *Daniel S. Bernheim*
                                              Daniel S. Bernheim 3d, Esquire
                                              Matthew R. Skolnik, Esquire
                                              Two Penn Center, Suite 910
                                              Philadelphia, PA  19102
                                              (215) 636-4468
                                              *Counsel for Defendants*

35